## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.** | **23-CR-33 (JDB)** |
| | : | | |
| **v.** | : | | |
| | : | | |
| **TONIO CALHOUN,** | : | | |
| | : | | |
| **Defendant.** | : | | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing.  For the reasons set forth below, the Government requests that the Court impose a sentence of 15 years' incarceration, to be followed by 25 years of supervised release and a 25-year registration period, pursuant to the Sex Offender Registration and Notification Act, 18 U.S.C § 2250, 34 U.S.C. § 20911(2), and 34 U.S.C. § 20915(a)(1), the U.S. Probation Office's programming recommendations and restitution as outlined in the Government's Sealed Supplement Regarding Restitution. In support of this sentence, the government states the following.

### FACTUAL BACKGROUND

On February 14, 2022, an employee of the file hosting service company Dropbox reported to the National Center for Missing and Exploited Children ("NCMEC") that Dropbox user #1922420000 (later determined to be the defendant, Tonio Calhoun) uploaded a video depicting suspected child pornography to the Dropbox servers. The video was labeled "falko. . .mkv(1)," hereafter "VIDEO 1."[1] The employee reported that VIDEO 1 had been uploaded to the defendant's

---

[1] The full title of the file is known to law enforcement, but it is redacted here in an effort to prevent the further dissemination of child pornography.

Dropbox account on February 12, 2022. After reporting the Dropbox user and VIDEO 1 to NCMEC, on February 14, 2022, Dropbox shutdown the account.

VIDEO 1 is a thirty minute and forty-six seconds long, compilation style video that depicts the sexual abuse of several prepubescent girls. The children can be seen having their vaginas penetrated by erect adult penises, having their mouths penetrated by erect adult penises, and being ejaculated on. One child – approximately six years' old – is shown wearing a blindfold, with her hands bound together, while an adult females rub the child's breast and genital or pubic area. The child can be observed crying during portions of the video. The video also shows the child's genital area being manipulated by an adult hand. The file was labeled "falko. . .mkv(1)" and concludes with "film IV PISS SCAT VIOLENCE contact me…"

Federal agents obtained a warrant to search the defendant's Dropbox Account (Account 1922420000). In response to the warrant, Dropbox provided two files, one which included the active account data for the defendant's account and another which included its deleted files.[2] The account's active files folder contained word documents labeled "Tonio Calhoun Testimony" and "Tonio Testimony," and a PDF labeled "Tonio Calhoun Resume – FOOD SERVICE 9-15-18." The defendant's deleted files folder included VIDEO 1. The deleted files folder also contained a second video labeled, "1644673061811577_(pthc). . .kids (3m3s)(2)" (hereinafter "VIDEO 2").[3]

VIDEO 2 is a three minute and three seconds long, compilation style video. VIDEO 2 shows prepubescent girls having their mouths penetrated by erect adult penises, the girls rubbing erect adult penises, and the girls having their genitals penetrated by adult male fingers. The last

---

[2] Dropbox allows users to access items in their deleted items folder for a period of 30 days.

[3] Law enforcement knows the acronym "pthc" stands for "pre-teen hard core" and refers to materials that depict the sexual abuse of prepubescent children.

portion of VIDEO 2 shows an adult penis rubbing against the exposed vagina of a prepubescent little girl.

On June 15, 2022, law enforcement executed a search warrant at the defendant's residence. They recovered a Samsung Cell Phone from his home and one from his person, each capable of accessing the internet. Law enforcement further recovered 19 envelopes containing photographs of young female children and teenage girls. In many of these photographs, the minor girl was partially dressed, wearing either underwear or a bathing suit. The children were also often posed in such a way that their partially clothed buttock or vagina was the focal point of the image.

Additionally, law enforcement recovered a composition book, written by the defendant, containing descriptions of potential story lines for movies depicting the sexual abuse and exploitation of very young children. For example, in this book the defendant wrote:

"Kindergarten C**ts[4] – scenes of hardcore sex featuring five-year-old girls in different settings ranging from kindergarten class, to daycare, to the family home. Straight man + girl and woman + girl action."

"Backdoor B****es – scenes of hardcore sex featuring preteen girls ranging in age from six to twelve years old and focusing exclusively on anal sex. Straight man + girl scenes only."

"Bukkake Bedlam – scenes of hardcore sex featuring preteen girls in gangbang situations."

"Blonde Paradise – scenes of hardcore sex featuring only blonde preteens. Straight man + girl scenes and woman + girl scenes."

"Sex Ed 101 – scenes of hardcore sex featuring girls ranging in age from six to twelve years old. All action happens on school grounds: classroom, principal's office, etc. Straight man + girl scenes and woman + girl scenes."

---

[4] For the purposes of this statement, asterisks have replaced the full spelling of the word.

On the defendant's cellular phones, law enforcement recovered over 100 additional images depicting child pornography, including images depicting infants and toddlers. One such image shows a toddler fully nude, laying on her back with her legs spread open while an adult male penis penetrates her vagina. Another image depicts a toddler with her face turned toward the camera as her mouth is penetrated by an erect adult male penis. Other images show children having their mouths, vaginas and anuses being penetrated by adult hands and penises. Law enforcement also recovered over 100 images of child erotica, depicting girls ranging from young toddlers to teenagers. Some images depict these little girls wearing thong style underwear, often posed in such a way that the child's buttocks is the focal point of the image. Additional images depict children wearing underwear or swimsuit bottoms, posed with their legs open, and positioned in a way that the focal point of the image is on the child's genital or pubic area.

## DEFENDANT'S SENTENCING GUIDELINES RANGE

All parties agree that the defendant's total offense level is 35, as outlined in the plea agreement.

All parties agree that a 2-level reduction is appropriate under U.S.S.G. § 3E1.1 and an additional 1-level reduction is appropriate under U.S.S.G.3E1.1(b). *See* Presentence Investigation Report, ECF No. 25 at ¶¶ 5. As a result, the parties agree that the defendant's Total Offense Level is 32.

## DEFENDANT'S CRIMINAL HISTORY

The Government agrees with U.S. Probation's criminal history calculation of 5, and a Criminal History Category of III. *See* PSI, ECF No. 25 at ¶ 135.

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553

In sentencing the defendant, the Court must take into account the factors set forth in 18

U.S.C. § 3553(a), as follows:

(1) the nature and circumstances of the offense and the history and characteristics of the

defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of

defendant as set forth in the guidelines—

(I) issued by the Sentencing Commission….; and

(II) that, . . . are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission … and

(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## SENTENCING RECOMMENDATION

The offense committed by the defendant is an extremely serious one. While out on supervised released after serving a lengthy term of incarceration for Distribution of Child Pornography in case 12-CR-218 (JDB), the defendant again possessed large quantities of Child Pornography. The material the defendant possessed, as detailed in the statement of offense, depicts atrocious violence against a very young child. In addition to the videos which initially made law enforcement aware of the defendant's crimes, searches into this residence and devices uncovered large amounts of additional material.

The Defendant's offenses have been perpetrated against the most vulnerable members of our society – children. Children captured in images and videos depicting their sexual abuse are traumatized and victimized in the worst way imaginable at the time the images were created, and they are re-victimized and re-traumatized each and every time an individual views the images for their own sexual gratification. As eloquently explained by the Sixth Circuit in a child pornography case:

> . . . we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of . . . children who are forced into these roles.

> . . . every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-22 (6th Cir. 2011) (quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

Each one of the images and videos the Defendant distributed and discussed represents an innocent child victim who had the worst moments of their lives forever memorialized and spread to countless offenders all over the world via the internet. *See Blinkinsop*, 606 F.3d 1110, 1118 (9th Cir. 2010) (finding that "[t]he children involved in pictorial and cinematic pornography additionally endure ongoing harm because their images have been preserved in a permanent medium"). In *New York v. Ferber*, the U.S. Supreme Court noted:

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.  A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.

458 U.S. 747, 759 n.10 (1982), *quoting* Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L.Rev. 535, 545 (1981).

The Defendant's persistent sexual interest in very young children and his distribution of child pornography is extremely serious and dangerous. The conduct that brings the Defendant before the Court was not a one-time occurrence, nor a mistake. The Defendant intentionally discussed, shared, and possessed child pornography. The Defendant's sexual interest in minors goes back many years, since his childhood. Given the extremely serious nature of the Defendant's criminal conduct, a Guidelines sentence is appropriate.

**The History and Characteristics of the Defendant**

<u>The Defendant's Prior Conviction</u>

In case 12-CR-218 (JDB), the defendant was convicted of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2).

At the time of his plea in case 12-CR-218 (JDB), the defendant admitted the following facts.

Leading up to April 21, 2012, Metropolitan Police Department Detective Timothy Palchak was acting in an undercover capacity as part of a multi-jurisdictional FBI/MPD Child Exploitation Task Force, operating out of a satellite office in Washington, D.C. In that capacity, Detective Palchak ("UC"), visited a website where individuals can post and/or read fictional stories about adults engaging in various sexual acts with children. Individuals may comment on the stories anonymously or with a screen name that attaches to their email address. Based on the experience of the detective in his undercover capacity, this website is frequented by individuals who have a sexual interest in children.

At approximately 8:00 p.m. on April 21, 2012, the UC observed an individual using the screen name "blackpedo," later identified as the defendant, post a comment on one of the stories on the child sex story website. In addition, the UC observed a story posted on the website by the defendant titled "A Day Out With Mommy," about a mother sexually abusing her four-year old daughter and allowing an adult male to sexually abuse her daughter. At approximately 12:07 a.m. on April 22, 2012, the UC sent an email to the defendant, stating, "Hey, just wanted to say hey, big perv here no limits, see you on [the website] all the time thought I would say hello. Big ped here…" On April 30, 2012, the defendant responded to the UC's message and began communicating with the UC by email.

Between April 30, 2012 and May 22, 2012, the UC and the defendant had sporadic email communication. During the course of these emails, the defendant told the UC that he is 30 years old and was originally from D.C. but now lives in Florida. When the UC asked if the defendant was "active with any," meaning sexually active with any children, the defendant replied that he did not "know any" but is "keeping his eyes open for any opportunities." The UC represented to the Case 1:12-cr-00218-JDB Document 21 Filed 01/10/13 Page 2 of 18 3 defendant that he was sexually active with his 12 year-old daughter. The defendant asked the UC if he was a "collector," which the UC understood to mean a collector of child pornography. The UC emailed a telephone number to the defendant, and the defendant sent his telephone number to the UC by text message.

On or about May 29, 2012, the UC received information from a cooperating witness ("C1"). C1 informed the UC that the defendant had sent it videos of child pornography by email within the last month. On May 29, 2012, C1 communicated with the defendant by telephone and email while C1 was in the presence of law enforcement in the District of Columbia. During course of these communications, C1 told the defendant that it knew the UC and had previously had sexual contact with the UC's 12-year-old daughter. In addition, the defendant sent to C1's law enforcement supervised email account the following three videos of child pornography:

(1) A 21 second video depicting a prepubescent female child, approximately 3 to 4 years-old, lying naked on a couch with her legs hanging off the edge and spread open. The child's vaginal area is exposed. The video then switches to an adult male penetrating the child's vagina with his penis.

(2) An 8 minute and 56 second video depicting a prepubescent female child lying naked on her back and touching her genitalia with her finger, masturbating. An adult male penetrates the child's vagina with his penis. The video zooms in and stays focused on the genital area of both.

(3) A 6 minute and 35 second video depicting an adult male taking the underwear off of a prepubescent female child and spreading her legs apart. The video then switches to an adult male penetrating the child's vagina with his penis. The video zooms in and focuses on the genital area of both. The male then ejaculates on the child's vaginal area.

On May 30, 2012, the UC received a text message from the defendant. Between May 30, 2012, and June 13, 2012, the UC and the defendant exchanged numerous text messages. During this time, on or about June 8, 2012, the defendant came back to the D.C. area. The defendant and the UC made plans to meet in person to look and photograph young girls in public. The defendant and the UC also planned for the UC to give the defendant's resume to a few friends and try to help fix the defendant's computer.

A sampling of the text messages between the defendant and the UC, including attachments, is described herein. As set forth in detail below, the defendant sent to the UC, among other things, two images of child pornography.

- At approximately 7:04 p.m. on May 30, 2012, the defendant sent a photograph to the UC of a young girl, approximately age 8 to 10 years old, wearing clothes and sitting in a seductive pose. At approximately 7:18 p.m. on May 30, 2012, the defendant sent a text message to the UC saying, "Yeah, all bullsit aside I'd fuck her too. I hope he send more. I'd b [sic]".

- At approximately 3:31 p.m. on June 8, 2012, the defendant sent an image of child pornography to the UC by text message. The image was of a young girl, approximately 2 years of age, facing the camera with her legs spread apart. The picture was focused on her vagina.

- At approximately 4:11 p.m. on June 8, 2012, the defendant sent a photograph to the UC of a young girl, approximately age 4 or 5 years old, wearing clothes and holding a bag. The defendant communicated to the UC that this was a girl he saw at the bus station.

- At approximately 9:00 p.m. on June 9, 2012, the defendant sent a message a text message to the UC saying, "Yeah. I don't know why in the hell I didn't think of that. She wasn't attractive but it still would've been worth it. Older sister was hot too. Probably like 7 or 8. I didn't even think to hit on the mom. Probably just let a good opportunity slip through my fingers".

- At approximately 9:06 p.m. on June 9, 2012, the defendant sent a text message to the UC saying, "Oh and there must have been some sort of kids event downtown this morning. When I got to metro center on the subway there were hot little bitches everywhere".

- At approximately 9:10 p.m. on June 9, 2012, the defendant sent a text message to the UC saying, "I mean I literally walked off the train and was like…son of a bitch. You don't know where to look. They were in every direction. It was like sensory overload or some shit. I gotta find out what was going on".

- At approximately 9:13 p.m. on June 9, 2012, the defendant sent a text message to the UC saying, "That sounds good. In Florida I took walks all the time looking for girls to check out. It's a hobby of mine".

- At approximately 8:03 p.m. on June 11, 2012, the defendant sent a text message to the UC saying, "Nice. I love 4 yos. Almost like a toddler but no more diapers. They're ready". • On June 11, 2012, the defendant and the UC exchanged text messages about getting together to go "toddler hunting."

- At approximately 8:10 p.m. on June 11, 2012, the defendant sent a text message to the UC saying, "Should be able to. With the warm weather there should be a lot of little skirts."

- At approximately 3:15 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "LOL I'm trying to ignore this hot little vid someone sent me last night. I'm afraid if I keep watching it I won't get anything done."

- At approximately 3:19 p.m. on June 12, 2012, the defendant responded to the UC's request to describe the video: "I don't know how old she is because it doesn't show her face but her ankles are tied in the air and she's getting fucked in both holes. It's about 2 min long."

- At approximately 3:22 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "He starts in her pussy then her ass then it shows him in her pussy again."

- At approximately 3:24 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Yeah the ones with sound are great. I've got one with mom licking her 2 yo pussy".

- At approximately 3:46 on June 12, 2012, the defendant sent a text message to the UC saying, "So I'm kind of new to cp. I only just started seeing it last year and that's only because of stuff people sent me. Is it all mostly just 30 second or like 2 minute clips? I've got a couple that are 10 mind [sic] or a little longer but I was expecting 30 min scenes like in adult porn. I guess it doesn't work that way."

- At approximately 3:50 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "I wonder why they overedit that shit. If I made one, you'd see everything".

- At approximately 3:53 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Well I guess I shouldn't complain. At least it's better than nothing."

- At approximately 4:31 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "You may have already seen it. But I've got this one pic of a girl with a dick in her

ass she's on top in reverse cowgirl and it looks like she's having an orgasm as she fingers her pussy".

- At approximately 4:35 p.m. on June 12, 2012, the defendant continued his description: "The girl is blonde maybe about 9 or 10 years old."

- At approximately 4:37 p.m. on June 12, 2012, the defendant sent an image of child pornography to the UC by text message. The image was of a pre-pubescent female, approximately 9 or 10 years old, who is not wearing any clothes and is being anally penetrated by an adult male penis.

- At approximately 4:42 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Yeah. I help but get real jealous every time I see pics like that."

- At approximately 4:46 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "I know. I keep thinking that should be my cock."

- The defendant and the UC exchanged text messages about the UC's fictional 12 year-old daughter and his purported sexual contact with her.

- At approximately 7:36 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "LOL I know what you mean. 12 is getting kind of up there. We need to find us something really young."

- At approximately 7:38 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Although I'd settle for a really hot 8 or 9 yo."

- At approximately 8:59 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Had to have a little private time before my mom and her husband got home. Thankfully I had Vicky to help with that." The UC understood "Vicky" to be a reference to particular a series of child pornography videos.

- At approximately 11:48 p.m. on June 12, 2012, the defendant sent a text message to the UC saying, "Yeah I just found out about her last year but from what I've learned, I guess she's like a celebrity among like-minded people such as us."

- At approximately 11:54 p.m. on June 12, 2012, the defendant sent a text message to the UC regarding their plans to get together the following day: "Should be good times. I haven't seen any little ones the last couple days, it's driving me crazy".

- At approximately 12:01 a.m. on June 13, 2012, the defendant sent a text message to the UC saying, "Yeah, my phone has a pretty decent camera. I like to get pics whenever I can."

- At approximately 12:07 a.m. on June 13, 2012, the defendant sent a photograph to the UC of a girl wearing clothes and standing with her back to the camera, with the focus on her buttocks and legs.

- At approximately 12:09 a.m. on June 13, 2012, the defendant told the UC where he got the picture: "Little hottie I saw at the mall in Florida a month ago".

- At approximately 12:11 a.m., the defendant sent a photograph to the UC of a young girl, approximately 5 or 6 years old, wearing clothes.

- At approximately 12:11 a.m. on June 13, 2012, the defendant sent a text message to the UC saying, "I gonna miss that damn mall."

- At approximately 12:33 a.m. on June 13, 2012, the defendant sent a text message to the UC saying, "You might catch some at Pentagon city on a Saturday but there's more young professionals and teens who think they're the shit shopping there. Not enough little girls for me."

- At approximately 12:42 a.m. on June 13, 2012, the defendant sent a text message to the UC saying, "Springfield mall used to be a good one too. Especially if you like the little

Spanish ones. But I heard they shut that mall down. I don't know. I haven't been in that area in years."

- The defendant and the UC exchanged text messages about the time and place of their meeting on the afternoon of June 13, 2012.

- At approximately 5:45 p.m. on June 13, 2012, the defendant sent a text message to the UC saying, "Alright. That's okay. It'll give me time to find the place and then take a little walk to look at the little ones."

On June 13, 2012, the defendant arrived at the previously arranged meeting site in Washington, D.C. The defendant approached and greeted the UC. The defendant told the UC that he brought his laptop computer for him to fix. The defendant also stated that he brought his resume for the UC. The UC said that he would drop off the defendant's resume and that he would drop of the defendant's computer off at the UC's place. The UC told him that they could then walk around and "look." The UC and the defendant began walking. The UC asked the defendant if he found "anything good." The defendant stated that he was "following a girl with a pink skirt on, she was about 8 years old, and she looked hot as hell."

The UC made a prearranged signal and the defendant was arrested by members of the Child Exploitation Task Force. Following his arrest, the defendant waived his Miranda rights and agreed to be interviewed by law enforcement. Among other things, the defendant admitted that he emailed child pornography to the UC and other people. The defendant admitted to having child pornography videos on his cellular telephone. The defendant admitted to having a sexual interest in children as young as 2 to 3 years-old, up to 11 or 12 years-old.

The defendant gave consent for law enforcement to search three of his email addresses, his cellular telephone, laptop computer, and a thumb drive. Upon a preliminary review of the

defendant's cellular telephone, law enforcement identified approximately 25 videos of child pornography. Upon a preliminary review of the defendant's laptop computer, law enforcement identified at least 2 videos of child pornography and at least 2 images of child pornography. Law enforcement found evidence – names of deleted files, for example – that other videos and/or images of child pornography had been viewed on the defendant's computer. Upon a preliminary review of the defendant's email accounts, law enforcement identified approximately 59 videos of child pornography and approximately 330 images of child pornography, including the following:

- A 1 minute and 26 second video depicting a prepubescent female child, approximately 2 years-old, lying naked on her back with her legs open exposing her vaginal area. A naked adult female is shown licking the child's vaginal area. The video then changes to a naked adult male penetrating the child's vagina with his penis. The man is on top of the child and his face cannot be seen.

- A 3 minute and 33 second video depicting a prepubescent female child, approximately 4 years-old, lying on her back with her underwear pulled down. An adult hand, which appears to be male, is seen helping the child spread her vagina open as the camera zooms in and focuses on her vagina for several seconds. The hand then digitally penetrates the child's vagina. The video switches to showing the child trying to put an adult male penis into her vagina. The man penetrates the child's vagina with his penis. The man penetrates the child's mouth with his penis. The man then masturbates until he ejaculates on the child's face.

- An image depicting a prepubescent female child sitting with her legs spread apart. Two clips are attached to her vaginal area and appear to be connected to a device that would be used to shock her. There is a caption at the top of the photo that reads, "On her ninth

birthday, Master gave her a new toy...." There is also a caption at the bottom that reads, "Punished Girl (c)."

- An image depicting what appears to be an infant female child whose legs are being held apart. An adult male penis penetrates the vagina of the child. The image is focused on the genital areas of both.

- An image depicting a prepubescent female child on her hands and knees on a bed. Her hands are tied to the bed with what appears to be white rope. A purple object is stuck in her vaginal area.

<u>The Defendant's Term of Supervised Release</u>

The defendant was released from incarceration on September 26, 2018. By December 30, 2018, probation expressed concern with his compliance and submitted a Petition for Modification of Conditions to this Court. *See* 12-CR-218 (JDB), ECF No. 32. His supervised release was then modified to include location monitoring. Subsequently, the defendant violated the terms of his supervised release and was sentenced to 6 additional months of incarceration. *See* 12-CR-218 (JDB), ECF No. 39.

In March of 2022, U.S. Probation filed an additional petition. Specifically, during a pre-polygraph examination, the defendant reported consuming marijuana and synthetic marijuana, viewing child pornography images, and using a work laptop and Roku device to search and view online pornography. He further admitted that he viewed images of minor children on devices unknown to and unmonitored by the probation office. Shortly thereafter, he was arrested for conduct charged in the instant case, which occurred on or about February 12, 2022 to February 14, 2022.

**Need for the Sentence Imposed**

The sentence requested by the Government is necessary to "reflect the seriousness of the offense, to promote respect for the law," "to afford adequate deterrence to criminal conduct," to "protect the public from further crimes of the defendant," and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The sexual exploitation of children, including online discussions about abuse, as well as the downloading, distributing, viewing and possession of child sexual abuse material, has devastating consequences for the children depicted in these images and videos. Once they find their way onto the Internet, images and videos depicting the sexual abuse of a child will circulate in perpetuity because individuals make the repetitive and purposeful decision to collect, save, and trade such images and videos for their own sexual gratification.

Furthermore, consumers and distributers of child pornography, like the Defendant, create a market and demand for the production of these images and videos, which depict the sexual abuse and exploitation of real children. These consumers and distributers contribute to the cycle of abuse and are in part responsible for the harm suffered by children used to produce the images and videos in their collections. *See United States v. Goff,* 501 F.3d 250, 259-60 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"); *see also United States v. Accardi*, 669 F.3d at 345 (D.C. Cir. 2012) (emphasizing that "child pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials.") In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims.  Young children were

raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007).

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the evil of child pornography:

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996). There is perhaps no greater invasion of privacy than that caused by the dissemination of child pornography. With a click of the button on a camera, the sexual abuse of these children is memorialized forever. It is terrible enough that a child must live with the memory of his or her initial abuse. It is hard to even comprehend how that child could then learn to cope with the fact that strangers everywhere are using the worst moments of that child's life to sexually gratify themselves and that he or she can do nothing to stop them from continuing to do so. The only recourse that these children have is the strong enforcement of the laws that hold these offenders accountable for the tremendous damage they have inflicted upon countless child victims.

The Defendant possessed and transferred materials depicting the sexual abuse and exploitation of real and very young children. The Court need only review the Victim Impact

Statements from the victims in the images and videos he possessed to understand the devastating effect that the production and dissemination of those videos actually has had on real child victims. Therefore, with respect to 18 U.S.C. § 3553(a)(2)(A), a Guidelines sentence, beginning with the mandatory minimum term of 15 years' incarceration, accounts for the seriousness of the Defendant's conduct.

### The Need for the Sentence to Afford Adequate Deterrence

Deterrence with respect to child pornography offenses is of particular importance for three reasons. First, serious penalties for child pornography offenders decrease the number of participants in the market, which in turn decreases the need for its production.

> The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.  The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

*Goldberg*, 491 F.3d at 672.

Second, both Congress and the courts have recognized the high recidivism rates for these types of offenders. *See* Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009) (compiling congressional statements regarding the high risk of recidivism among child sex offenders); *Accardi*, 669 F.3d at 346 (noting that "a number of circuits have upheld [sentences] . . . for defendants convicted of possession of child pornography based on the same general concerns about recidivism") (citing *United States v. Cope*, 527 F.3d 944, 952 (9th Cir. 2008) (noting that, there, the "sentence [was based] on general concerns about recidivism and protection of the public."))); *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008); *United States v. Allison*, 447 F.3d 402, 405-06 (5th Cir. 2006); *United States v. Garthus*, 552 F.3d

715, 720 (7th Cir. 2011) ("We need evidence-driven law just as we need evidence-driven medicine . . . statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children") (citations omitted)).

Third, there is an undeniable link between sexual contact offenses and the receipt and distribution of child pornography. "An offender's pornography and erotica collection is the single best indicator of what he wants to do." *See* Lanning, Kenneth V., *Child Molesters: A Behavioral Analysis – For Professionals Investigating the Sexual Exploitation of Children*, Office of Juvenile Justice and Delinquency Prevention, Fifth Ed. 2010, at 107.

### The Victims are Entitled to Restitution

Prior to December 7, 2018, Title 18 U.S.C. § 2259 directed that, "notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offenses under this chapter." 18 U.S.C. § 2259(a); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution was defined to include "the full amount of the victim's losses," which includes any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
>
> (B) Physical and occupational therapy or rehabilitation;
>
> (C) Necessary transportation, temporary housing, and child care expenses;
>
> (D) Lost income;
>
> (E) Attorneys' fees, as well as other costs incurred; and
>
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015). The Court may not decline to issue an order under this section because of the economic circumstances of the defendant. 18 U.S.C. § 2259(B)(i).

In *Paroline v. United States*, 572 U.S. 434 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 572 U.S. at 439. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps. First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 448. Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 457-59. Recognizing that under the circumstances of most child pornography possession cases – where losses resulted from harm caused by the trafficking of a victim's images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact," *id*. at 455, - the Court held:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 458. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id.* at 459. That is, in part, because a restitution order under § 2259

serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.* Third, the Court provided sentencing courts the following guidance for how to determine the proper amount of restitution under this standard. *Id*. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*.

The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*. at 460.

Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000.00. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (December 7, 2018). As detailed in the Restitution Request materials submitted to this Court under seal, some of the victims depicted in the images and videos the Defendant distributed, viewed, and possessed are seeking restitution for costs associated with attending psychotherapy and/or counseling, medications, loss of income,

loss of housing, and for various medical expenses. *See United States v. Monzel*, 930 F.3d at 486 (D.C. Cir. 2019) (noting that *Paroline*'s § 2259(b) restitution calculation is based on the defendant's "contribution to [the victim's] '*general* losses,'" and that the district court's calculation should be "a matter of 'discretion and sound judgment,'" considering the *entire totality* of the defendant's contributions, rather than a narrow, unnecessarily precise "exercise in long division") (emphasis added) (citing *Paroline*, 572 U.S. at 459-60)). The following victims in these known series of images have made restitution requests which have been submitted separately under seal to the Court: Aprilblonde, 2crazygurls, Jenny, Lighthouse1, and Sweet White Sugar. For the reasons set forth above, the government respectfully requests that the Court order restitution in the amount of $31,000.00 to be paid by the Defendant.

**Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, each of these factors requires a lengthy sentence of incarceration within the sentencing guideline range. Based on these factors, the government respectfully requests that the Court impose a sentence of 15 years' incarceration followed by a period of 25 years' supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:      /s/ Meredith E. Mayer-Dempsey
Meredith E. Mayer-Dempsey
N.Y. Attorney No. 5213202
Assistant United States Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, DC 20530
Phone: (202) 252-7259